UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HEWLETT-PACKARD COMPANY,        :

                Plaintiff,     :     04 Civ. 2791 (TPG)(DCF)

       - against -         :     **OPINION**

FACTORY MUTUAL INSURANCE     :
COMPANY,

                        :

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In this action plaintiff, Hewlett-Packard Company ("HP"), seeks to recover from defendant, Factory Mutual Insurance Company ("FM"), for losses incurred as a result of employee sabotage of the program for marketing a newly developed computer server. The court has before it several motions for summary judgment or partial summary judgment.

FM has moved for summary judgment dismissing the case on the ground that HP failed to give timely notice of loss.

HP moves for partial summary judgment striking FM's defense based on the claim of untimely notice.

FM moves for partial summary judgment, seeking to have the court rule that HP's recovery on the insurance policy is limited to $50 million.

HP moves for partial summary judgment, seeking to have the court rule that the $50 million limit does not apply as FM contends.

FM moves for summary judgment, seeking to have the court rule

that a provision in the insurance policy regarding research and development bars HP from recovering lost earnings.

HP moves for partial summary judgment, seeking a ruling that its proof of loss (as distinct from notice of loss) was proper and timely.

The court has recently granted HP the right to amend the complaint. However, both sides agree that this amendment will not affect the issues raised on the summary judgment motions.

The court rules that HP's motions for partial summary judgment should be granted, and FM's motions for summary judgment and partial summary judgment should be denied.

### Facts

HP is seeking to recover under an all risks policy, No. UR396, issued by FM, which was effective from May 1, 1999 to May 1, 2002. The facts surrounding the losses are largely undisputed. The issues raised by the motions are largely about policy interpretation.

Dr. Hock-Bing Lim was a member of HP's Commercial Performance Team. A computer industry entity known as the Transaction Processing Council apparently issues benchmarks for the measurement of certain aspects of computer performance. One of these is the "TPC-C" benchmark dealing with the computing speed of high-end computer servers.

HP was planning to put on the market a new server of this kind, to be known as the "Superdome." HP's Commercial Performance Team had the

-3-

responsibility of doing what was necessary to determine the speed of the Superdome in relation to the TPC-C benchmark. It was necessary to build a large database on which HP could run the TPC-C benchmark test for the Superdome.

It is now known that by August 2000, shortly before HP was to launch the Superdome, Lim had begun to sabotage the efforts to build the necessary database. HP was therefore not able to build the database in a timely fashion and was not able to publish a TPC-C result to coincide with the launch of the Superdome. HP managed to publish test results a few months later, but IBM was able to make a better showing. HP planned to surpass IBM by March 2001, following an upgrade of the Superdome. However, on January 18, 2001 the TPC-C database was destroyed. It is now known that Lim was responsible. For seven months thereafter Lim prevented HP from rebuilding it.

HP contends that Lim disguised his activities to make the problems appear to be the type of problems which might be encountered because of the nature of the project. Although FM does not agree with this contention, it is borne out by the facts, and there can be no real doubt that this is what occurred.

On the evening of September 10, 2001 an HP manager caught Lim accessing files on a co-worker's computer. This led to the prompt discovery that Lim was committing sabotage, although the full details only emerged gradually.

Within two months HP's Commercial Performance Team successfully built a database to run the TPC-C benchmark test and arrive at a "leadership" benchmark result. Superdome sales increased dramatically in 2002.

HP seeks to recover for loss of sales during the time there was a delay in achieving the benchmark result, which was key to the level of sales HP ultimately achieved.

## The Motions

Late Notice

The insurance policy imposes the following requirements regarding notice (p.43).

> In the event of a loss the Insured will:
>
> A. Give immediate written notice to this Company.

FM contends that the January 18, 2001 destruction of the database was a loss which triggered the requirement to give immediate notice. HP contends that it did not have sufficient grounds for believing that it had a loss for which it could recover until HP discovered the sabotage, in September 2001. HP gave notice on October 4, 2001 and contends that this was timely.

The issue raised by the motions on late notice have to do with policy interpretation. FM does not seriously challenge the facts about Lim's concealment of his sabotage until September 2001. What FM contends is that

-5-

HP had no right to wait until the discovery of the sabotage to give the notice,

but was required, under the policy, to give notice in January 2001, based upon

the destruction of the database.

The court rules that it was entirely reasonable for HP to wait until

it believed that there was a recoverable loss before giving notice, and this did

not occur until the discovery of the sabotage in September 2001.

Reasonableness is the standard. Commercial Union Ins. Co. v. Int'l. Flavors &

Fragrances, 822 F.2d 267, 272 (2d Cir. 1987). The policy provision about

giving immediate notice must be read in the context of other relevant policy

provisions. The policy contains the following exclusion from coverage (p. 30):

> As respects electronic data processing
> equipment, Media and data, the following
> is added under item C of EXCLUSIONS:
>
> 1. Error in programming or machine
> instructions.

(Emphasis in original). Moreover, the policy excludes loss from "faulty

workmanship, material, construction, or design" (p. 28). Finally, the policy

excludes loss from "any unexplained loss" (p. 27).

In the present case, after destruction of the database occurred in

January 2001, an intensive effort was made to discover the cause. There was a

"computer room" investigation to inquire after physical causes that might have

occurred, such as an air conditioning failure or an electrical failure or power

surge. But no physical casualty was discovered. The cause of the database

destruction was something which the saboteur had cleverly disguised. And thus, the problem appeared to be of an uncertain nature, within the workings of the computer technology.

Since there was no indication of any physical casualty, such as overheating or electrical failure, and since there was nothing at the outset to indicate sabotage, HP was dealing, as far as it knew, with precisely what is covered in the exclusions - possible error in programming or machine instructions, possible faulty workmanship, material, construction, or design, and an unexplained loss. What is described here has been conclusively shown on the present motions, and this demonstrates that HP could not reasonably know that it had sustained a loss covered by the insurance - one that was not within the exclusions - until it discovered the sabotage in September 2001.

However, FM's position is that HP had no right to delay giving notice until it resolved these uncertainties. The court disagrees.

The court holds that it was reasonable, and indeed sensible, for HP to give notice only after it had a basis to believe that there was a loss which was covered by the policy. The decision in Brooks v. Zurich-American Ins. Group, 330 A.D. 2d 176, 753 N.Y.S.2d 454 (1st Dept. 2002) is authority for this conclusion. The cases cited by FM are distinguishable on their facts and in respect to the policies involved.

The $50 Million Limit

HP seeks to recover from FM for property damage, particularly to

the database, and for loss of sales during the time when it was delayed by the sabotage in achieving the successful benchmark test, which it did achieve after the sabotage was uncovered. The insurance policy refers to this as a claim for "Combined Property Damage and Time Element."

The policy has various provisions about limits of liability. The basic provision is that the limit of liability for any one occurrence will not exceed $750,000,000, subject to a $10,000,000 deductible. There is no issue about this limit in the present case because the claim is for far less.

The issue here arises because of a list of "sublimits" described on pages 3-4 of the policy. Item 6 on this list is as follows:

> 6. Electronic data processing - Media $50,000,000.

FM contends that this limit of $50 million applies to HP's entire claim - both property damage and time element. HP argues that the limit applies only to property damage. The amount of HP's claim, for both property damage and time element, is more than $50 million.

HP's argument is supported by the fact that two of the items on the list specifically state that the limit applies to both property damage and time element, whereas the item for Electronic data processing - Media does not. Thus the first item reads:

> 1. Contingent Time Element: $750,000,000.
>
> a. Service Interruption: $10,000,000

> combined property damage and time
> element.

Item 15 reads:

> 15. Service Interruption: $50,000,000
> combined property damage and time
> element

Since there are these specific references to the sublimits as

applying to "time element," it is natural to read any item that does not include

such reference as not imposing a sublimit on the "time element."

The policy contains a lengthy discussion under the heading "Time

Element," beginning at page 5. The major category of loss to be recovered in

connection with the Time Element is said to be Gross Earnings which would

have been earned during a "Period of Interruption." There is a definition of

Period of Interruption at page 7. This definition includes the following item,

pertaining to data processing.

> E. The time required with the exercise of
> due diligence and dispatch to recreate or
> restore the physically lost or damaged or
> destroyed data, programs, or other
> software stored on electronic, electro-
> mechanical, electro-magnetic data
> processing or production equipment
> including the time for researching or
> engineering lost information.

In addition to Gross Earnings loss, another type of loss which can

be recovered under the heading Time Element is Commissions, Profits and

Royalties. The commissions and profits pertain to sale of goods. There is a

-9-

definition of the Period of Interruption pertaining to this category of coverage (Commissions, Profits and Royalties), and the definition includes the same description just quoted pertaining to data processing.

It should be noted that towards the end of the policy, there is a "Definition" section which includes the following definition at page 47.

> 5.  Electronic data processing "Media"
> means data, programs or any other
> software stored on electronic, electro-
> mechanical, electro-magnetic data
> processing or production equipment.

It is significant that in the entire lengthy description of Time Element, including the definitions of Period of Interruption, there is nothing about a dollar limit or sublimit.  In the definition of electronic data processing there is no mention of anything about a dollar limit.

The policy contains a provision for coverage during what is called "Extended Period of Indemnity."  Such coverage applies as follows (p. 11):

> C.  Beginning on the date on which
> liability of this Company for loss resulting
> from interruption of business would end
> without this coverage, but

> D.  In no event for more than 180 days
> from that date.

Also there is coverage of something, briefly noted earlier, entitled "Contingent Time Element."  This covers loss sustained during a period of interruption where the casualty occurred to property at the insured's suppliers' or customer's locations (p. 11).  With respect to both the Extended Period of

Indemnity and the Contingent Time Element, there are sublimits of liability specified in the list on pages 3 and 4. It is $1 billion in the case of the Extended Period of Indemnity and $750,000,000 in connection with the Contingent Time Element, except for a $10 million limit for "combined property damage and time element" in connection with the service interruption involved in the Contingent Time Element.

The format of the policy applicable in the present case, No. UR396, is different in a crucial respect from the policy which preceded it, No. UR286. In UR286 there was a similar list of sublimits, which included a limit of $50 million for Electronic data processing - Media (p. 32). As in No. UR396, there was no specification about the limit applying to Time Element. However, in a section containing "Conditions & Stipulations," there was the following section under the heading "Electronic data processing - Media" (p. 5.5).

> Item 3(b) under PERIOD OF
> INTERRUPTION of the Gross Earnings
> Endorsement, Form 3201 is hereby
> declared null and void and the following is
> substituted therefor:
>
>> (b) Time Element Coverage is
>> specifically provided under
>> this clause for Electronic Data
>> Processing Equipment and
>> Media. Such Time Element
>> Coverage shall include the
>> additional time that would be
>> required, using due diligence
>> and dispatch, for research,
>> engineering or other cost of
>> restoring or recreating

information lost.

All subject to a limit as indicated in the
Sub-Limits of Liability section of this
Policy.

It is unnecessary to discuss what is declared null and void. The essential point
is what is "substituted therefor." And in that connection the Time Element
Coverage is stated to be subject to the sublimits section of the policy. Thus the
$50 million sublimit specified in the listing for Electronic data processing -
Media is specifically said to apply to Time Element Coverage.

When the new form was prepared, which was the form used for
No. UR396, the provision about the sublimits applying to Time Element
Coverage for Electronic data processing - Media was dropped. The result is
that in the new policy there is no sublimit of $50 million or any other sublimit
applicable to the Time Element Coverage for Electronic data processing -
Media. There is no such sublimit specified in any listing, in any definition, or
in any description of coverage whatever.

Research and Development

FM contends that there is a provision in the policy regarding
research and development which bars the type of recovery which HP is seeking.
This provision occurs in the section which defines the Gross Earnings which
can be recovered during a Period of Interruption. This is under the heading
Time Element. In this section of the policy there is a description of how Gross
Earnings are to be computed. The passage reads as follows:

Gross Earnings are computed as follows:

> a. for manufacturing operations: the net
> sales value of production less the cost of
> all raw stock, materials and supplies
> utilized in such production.
>
> b. for mercantile or non-manufacturing
> operations: the net sales less cost of
> merchandise sold, materials and supplies
> consumed in the operations or services
> rendered by the Insured.
>
> c. for research and development
> operations: the continuing fixed charges
> and ordinary payroll directly attributable
> to the interruption of research and
> development activities, which in
> themselves would not have produced
> income during the indemnity period.
>
> Any amount recovered under property
> damage coverages at selling price for loss
> or damage to merchandise will be
> considered to have been sold to the
> Insured's regular customers and will be
> credited against net sales.

It is subparagraph (c) on which FM relies. FM contends that where the

casualty occurs in research and development operations, all that can be

recovered are "fixed charges and ordinary payroll." FM contends that the

activity of HP in connection with development of the database and the TPC-C

test result was all research and development. This means, according to FM,

that all that HP can recover are "fixed charges and ordinary payroll" caused by

the interruption of the research and development. Apparently this would be a

relatively small amount and not over the $10 million deductible. FM contends

that this provision of the policy bars HP from recovering its lost earnings during the Period of Interruption.

In the court's view FM misreads the policy. The obvious purpose and meaning of subparagraph (c) is to take care of a situation where the casualty occurs in research and development operations, and where such operations are not related to any actual sales, so that no sales or earnings are lost. Subparagraph (c) recognizes that there might still be a loss during a Period of Interruption of research and development work. This could be, as the policy states, a loss created by having "continued fixed charges and ordinary payroll" while the research and development work is suspended.

But subparagraph (c) in no way bars recovery in a situation where the injury to research and development results in a loss of earnings. This is made clear by the concluding phrase, which states that the subparagraph only applies where the interrupted "research and development activities . . . in themselves would not have produced income during the indemnity period." This means inevitably that where interrupted research and development activities would have produced income during the indemnity period, there can be recovery of such lost income or earnings.

There is a dispute about whether the work on the database in preparation for the benchmark test was or was not research and development. FM points to parts of the record which support the idea that it was. HP points out that the sabotaged activities were not research and development, in the

-14-

sense of being theoretical and unrelated to immediate sales, but were directly related to the imminent marketing of an important product - the Superdome.

The undeniable fact is that the database and TPC-C test project had no other purpose than to support the marketing of a product HP was then launching. But for the sake of the application of the insurance policy, there is no need to draw some sharp line between research and development activities and other activities defined as more closely related to selling. It may well be that there is no sharp line. But the insurance policy recognizes that there can be research and development which, when interrupted by a casualty, can result in lost earnings, and in that event there can be recovery of such lost earnings.

FM is not entitled to a ruling that the insurance policy provision about research and development bars HP's claim for lost earnings.

Proof of Loss

FM poses an affirmative defense that HP failed to submit a timely proof of loss. HP moves for partial summary judgment, seeking a ruling that it did submit a timely proof of loss.

The insurance policy provides that, in addition to giving immediate notice of the loss, a signed and sworn proof of loss must be provided. The policy provides that the Insured will

> D. Give a signed and sworn proof of loss
> to this Company within 90 days after the
> loss, unless that time is extended in

writing by this Company.  The proof of
loss must state the knowledge and belief
of the insured as to:

> 1.  the time and origin of the
> loss.

> 2.  the Insured's interest and
> that of all others in the
> property.

> 3.  the actual cash value and
> replacement value of each
> item and the amount of loss to
> it; all encumbrances; and all
> other contracts of insurance,
> whether valid or not, covering
> any of the property.

> 4.  any changes in the title,
> use, occupation, location,
> possession or exposures of the
> property since the effective
> date of this policy.

> 5.  by whom and for what
> purpose any location insured
> by this policy was occupied on
> the date of loss, and whether
> or not it then stood on leased
> ground.

FM contends that the correspondence between the parties, and the

documents exchanged, raise issues of fact as to whether a proof of loss was

submitted as required by the policy.

The court rules that the record shows conclusively that HP did

more than enough to comply with the proof of loss requirement.  On December

4, 2001 Erik R. Lonson, Claims Adjustor for FM, wrote Cedric Hughes, Risk

Manger for HP, asking for information about HP's claim. On December 13

Burton D. Endsley wrote Lonson with a detailed description of what it then

knew about the losses created by the sabotage perpetuated by Lim. The letter

stated that the exact amount of HP's losses had not yet been calculated, but

provided preliminary estimates of certain elements of the loss and an overall

loss estimate of $150 million. FM sent HP a blank proof of loss form. In a

letter dated December 14 Endsley wrote Lonson requesting an extension of

time for the filing of a "formal proof of loss," but sending what he referred to as

a "partial proof of loss." What was sent with Endsley's December 14 letter was

a sworn proof of loss on FM's form, executed and sworn to by Cedric Hughes,

which incorporated by reference the December 13 letter. By letter dated

December 21 FM set a deadline of March 21, 2002 for HP to submit a new

proof of loss. FM returned the original of HP's proof of loss, but kept a copy for

FM's files.

HP retained a forensic accountant to prepare a detailed analysis of

HP's business interruption loss. On March 4, 2002 HP submitted to FM a

calculation of the claimed loss, which was said to total $167.8 million. There

has been testimony about this document in depositions, but a copy has not

been submitted. On March 11 Endsley sent Lonson an enormously detailed

description of the known facts about the loss together with calculations of the

amount claimed. A copy of this is in the record. The estimate of the amount

was reduced from $167.8 million to $131.6 million.

The March 4 and March 11 submissions were not sworn statements. Although in December FM had provided its form of proof of loss to be signed under oath, no such form was provided thereafter.

There is no evidence that FM objected to the March 4 and March 11 submissions either as to form or substance. Specifically, there was no objection to the fact that they were not under oath.

There can be no doubt about the fact that HP complied with the policy requirement regarding proof of loss. All that one needs to do is to read the letters between the parties and to read the factual submissions by HP, particularly the immensely thorough report of March 11, to realize that HP was striving in the utmost good faith to provide FM with as much detail as possible about its claim, the basis for the claim, and estimates of the dollar amount of the loss. The materials must be read in full in order to fully appreciate what HP was doing.

As far as the requirement of a sworn statement, the sworn proof of loss submitted in December satisfies that requirement. HP called it a "partial proof of loss." This was obviously because it was all that HP could provide at the time, and HP agreed to provide a fuller proof of loss later. But none of this detracts from the fact that HP filed, in December 2001, a sworn proof of loss. Thus the requirement of the insurance policy was complied with.

As to what occurred in March, the submissions were not in the form of a sworn proof of loss. However, the record shows that FM often

-18-

accepts, in lieu of a sworn proof of loss, an unsworn statement from the insured that gives the necessary information.  In any event, in the present case FM acquiesced in having the detailed information, presented in March in the form of unsworn statements.

Since the literal requirement of the policy as to a sworn proof of loss was met in December 2001, and since this was followed by a quantity of further detail in March 2002 in unsworn statements which FM did not object to, the court rejects FM's claim of untimely and improper proof of loss.

### Conclusion

FM's motion for summary judgment dismissing the case for failure to give timely notice is denied.

HP's motion for partial summary judgment striking FM's late notice defense is granted.

FM's motion for partial summary judgment to impose a sublimit of $50 million is denied.

HP's motion for partial summary judgment, seeking a ruling that the $50 million sublimit does not apply, is granted.

FM's motion for summary judgment based on the research and development provision in the insurance policy is denied.

HP's motion for partial summary judgment, seeking a ruling that

its proof of loss was proper and timely, is granted.

SO ORDERED.

Dated:     New York, New York
           March 30, 2007

                                   THOMAS P. GRIESA
                                   U.S.D.J.